UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD GOSZTYLA, | No. 2:22-cv-01276-KJM-EFB (PC) |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| AULD, et al., | |
| Defendants. | |

Plaintiff is a state prisoner proceeding without counsel in an action brought under 42 U.S.C. § 1983. On August 6, 2024, pursuant to 28 U.S.C. § 1915A(a), the court determined that plaintiff's second amended complaint[1] (SAC) alleged potentially cognizable Eighth Amendment and Fourteenth Amendment claims against defendants Auld (a supervising registered nurse), Hla (a physician and surgeon), and Malet (an osteopathic physician and surgeon). ECF Nos. 45, 48. Defendants now move for summary judgment. ECF No. 54. Plaintiff has responded, ECF No. 58, and defendants have replied, ECF No. 59. For the following reasons, defendant's motion for

---

[1] The court had already determined that plaintiff's first amended complaint (FAC) alleged potentially cognizable Eighth Amendment and Fourteenth Amendment claims against defendants Auld, Hla, and Malet. ECF Nos. 10, 11. The claims against these three defendants are virtually identical in the FAC and in the SAC. The SAC attempted to add a claim against a defendant identified as "CCHCS IGHCPHP," allegedly the California Correctional Health Services' Interim Guidance for Health Care and Public Health Providers. ECF No. 45 at 3, 5. This was construed as an attempt to allege a claim against CCHCS and was dismissed because CCHCS has Eleventh Amendment immunity. ECF Nos. 60, 62.

1

1  summary judgment must be granted.

## The SAC

The SAC alleges that on December 10, 2020, plaintiff began to decline testing for Covid-19 due to perceived carelessness of medical staff in administering the tests. ECF No. 45 at 4. His refusal led to his being placed in quarantine on December 28, 2020, even though he showed no signs or symptoms of illness. Prison officials placed a sign outside his door that stated 1) plaintiff's name, 2) "Failure to Test," 3) "Compliance with future testing will allow removal from 21 day quarantine," and 4) a start date (12/28/2020) and an end date (1/18/2021) for the "21 Day Medical Quarantine Required." *Id*. at 9.

Plaintiff alleges that the sign displayed his private medical information to inmates, non-medical staff, and non-custody staff. *Id*. at 4. He claims this violated the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and his rights under the Fourteenth Amendment. *Id*.

Plaintiff further alleges that prison administrators halted all general programming until all prisoners complied with testing. *Id*. at 6. He alleges that the quarantine sign identified him as being responsible for the halt, that this unreasonably exposed him to threats to his safety, and that this also violated his right to refuse medical treatment. He alleges that defendants violated his rights under the Eighth Amendment by failing to protect his safety.

## Defendants' Motion for Summary Judgment

The parties have minimal factual disputes. Instead, they disagree about whether plaintiff has shown evidence, construed in his favor, that is sufficient to support any constitutional claim against them.

Regarding plaintiff's Fourteenth Amendment claim, defendants' arguments are that: (1) plaintiff has not shown a violation of a Fourteenth Amendment right to medical privacy; (2) none of the defendants placed the sign on plaintiff's cell door or authorized it to be placed there; and (3) none of the defendants was responsible for the relevant Covid-19 protocols so they are not proper parties.

////

As to plaintiff's Eighth Amendment claim, defendants argue that plaintiff was not subjected to an objective or actual threat from other inmates and that defendants did not act with deliberate indifference.

Finally, plaintiff alleges he exhausted a grievance process on these issues. ECF No. 45 at 6, 10-20. Defendants counter that plaintiff did not exhaust administrative remedies against them on any claim. Defendants also argue they are entitled to qualified immunity. ECF No. 54.

### Plaintiff's Deposition Transcript

Defendants submitted excerpts or plaintiff's deposition transcript with their motion for summary judgment. ECF No. 54-7. In accordance with Local Rule 133(j), defendants have lodged a copy of the entire transcript with the court. ECF No. 63. The court has reviewed the full transcript and finds that an additional page of the transcript adds context to the excerpted pages and is relevant to analysis of plaintiff's Eighth Amendment claim. Accordingly, the court will direct the Clerk to file page 25 of the transcript ("Tr.25") on the public docket of this case.

### Summary Judgment Standard Under Rule 56

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see*

1  *also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, . . ., is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

////

////

4

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Central Costa County Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

Fourteenth Amendment Medical Privacy Claim[2]

A.   Legal Standard

The Ninth Circuit Court of Appeals has held that prisoners have no constitutional right of privacy in their prison treatment records "when the state has a legitimate penological interest in access to them." *Seaton v. Mayberg*, 610 F.3d 530, 534 (9th Cir. 2010). The Ninth Circuit Court noted that "[p]risons need access to prisoners' medical records to protect prison staff and other prisoners from communicable diseases and violence, and to manage rehabilitative methods." *Id*. at 535. The court observed that legitimate penological concerns broadly include protecting prisoners and staff from conditions such as AIDS and HIV and also "contagious disease such as pinkeye or strep throat" or mental health conditions that may manifest violent predatory behavior. *Id*. A prison "may owe a duty, possibly a constitutional duty," to take protective measures. *Id*.; *see also Murphy v. Thompson*, 15 F. App'x 417, 418 (9th Cir. 2001) (a prisoner's privacy rights are circumscribed by the government's interests in protecting the public when making parole decisions). *Seaton* also "put[s] the burden on the prisoner to plead 'facts to rebut the connection

---

[2] Plaintiff's medical privacy claims arise, if at all, under the Fourteenth Amendment because HIPAA does not provide a private cause of action. *Webb v. Smart Document Sols.*, LLC, 499 F.3d 1078, 1080 (9th Cir. 2007). Also, "[a]n alleged HIPAA violation cannot form the basis for a [42 U.S.C. §] 1983 claim." *Huling v. City of Los Banos*, 869 F. Supp. 2d 1139, 1154 (E.D. Cal. 2012).

5

between disclosure of his prison treatment records and the State's legitimate penological objectives during his custody.'" *Newman v. Poquette*, No. 11-3866 ODW (MRW), 2012 WL 487116, at *3 (C.D. Cal. Jan. 12, 2012) (quoting *Seaton*, 610 F.3d at 535).

After outlining these general principles, the *Seaton* opinion stops short of providing more specific guidance about the contours of any privacy rights that prisoners may have in their medical information.[3] Courts in the Ninth Circuit have noted that "the constitutional right of informational privacy is murky, at best." *Huling v. City of Los Banos*, 869 F. Supp. 2d 1139, 1154 (E.D. Cal. 2012) (quoting *O'Phelan v. Loy*, No. 09-236 SOM, 2011 WL 719053, at *11 (D. Haw. Feb. 18, 2011)).

B. Analysis

1. Application Of *Seaton*

The disclosed information which is the subject of plaintiff's Fourteenth Amendment claim is the fact of his quarantine, the reason for it (failure to test), and its duration. The parties do not address the "murky" question whether these tersely stated facts fall within the realm of potentially protected medical information that may be encompassed within a constitutional right to privacy.[4] On this motion for summary judgment, and absent persuasive contrary authority in the briefing, the court will construe this question in plaintiff's favor.

////

---

[3] The Ninth Circuit Court stated it was "join[ing] our sister circuits," and cited cases from seven other circuit courts. 610 F.3d at 534 & n.18. Some courts in other circuits have attempted to articulate standards such as whether the nature of a disease requires privacy protection, but there is general agreement that a prisoner's right to privacy in medical records is limited. *See, e.g., Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) (the only medical conditions that warrant privacy protection are those of an "excruciatingly private and intimate nature" or are "likely to provoke both an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others"); *Payne v. Taslimi*, 998 F.3d 648, 658 (4th Cir. 2021) (prisoner had no reasonable expectation of privacy in information about his HIV status, mentioned by doctor at bedside in the prison's medical unit); *Archie v. Smith*, No. 20-cv-7649 (NLH) (KMW), 2020 WL 6938360, at *2 (D.N.J. Nov. 25, 2020) (Covid-19 "is not an 'unusual medical condition' that would likely expose a person to ridicule or discrimination").

[4] Certain kinds of status or category disclosures may be inherently unavoidable in the circumstances of a pandemic. For example, if all prisoners had been tested and the housing unit was allowed to program, this would have implicitly informed everyone that all of them had tested and none of them had positive results.

6

Assuming that the information on the quarantine sign does indeed constitute a potentially protected medical record, there is no genuine issue that displaying quarantine information on plaintiff's cell door did not violate whatever constitutional right to privacy plaintiff may have under *Seaton*. Plaintiff claims that there was no legitimate penological interest in placing a sign which was visible to inmates who were able to move about the prison and see it. ECF No. 58 at 2. To the contrary, there are obvious legitimate penological reasons, of the sort explicitly contemplated in *Seaton*, for posting the quarantine sign on plaintiff's door.

Protection from contagious disease is a legitimate penological concern. *Seaton*, 610 F.3d at 535. Prison administrators have a duty to protect other prisoners and staff from persons with contagious conditions. *Id.* In the circumstances of a pandemic, prison administrators have a legitimate penological reason to identify the presence of persons whose potentially contagious status has not been determined. Other persons present in the prison may need to take appropriate measures to protect against contagion insofar as possible, especially in unforeseen circumstances such as an emergency requiring immediate interventions and close contact. Plaintiff has the burden to show an absence of legitimate penological reasons for the sign. *Seaton*, 610 F.3d at 535. He has failed to carry this burden. This is sufficient reason to grant summary judgment for defendants as a matter of law.

        2.    <u>Defendants' Other Arguments</u>

Defendants each declare that the California Correctional Health Care Services (CCHCS) issued Interim Guidance[5] for clinical management of the Covid-19 pandemic at California prison facilities and that the guidance included

> … policies and procedures for treating inmates with suspected COVID-19; providing clinical and testing criteria for releasing inmates from isolation after the onset of symptoms and/or positive test results for COVID-19; testing inmates for COVID-19; isolating or quarantining inmates who contacted COVID-19; and removing inmates from isolation or quarantine.

ECF No. 54-4 at 2, ¶ 4 (Auld); ECF No. 54-5, ¶ 3 (Malet); ECF No. 54-6 at 2, ¶ 4 (Hla). It is

---

[5] The parties have not submitted a copy of the Interim Guidance. A CCHCS webpage on the topic of "COVID-19 and Seasonal Influenza: Interim Guidance for Health Care and Public Health Providers" merely states that the page is under revision to reflect changes in current response efforts. See https://cchcs.ca.gov/covid-19-interim-guidance/.

7

implied but unclear from defendants' declarations whether there was a directive for the sign that was placed on plaintiff's door, and whether such a directive came from the Interim Guidance or was issued separately by prison administrators.

Each of the defendants also declares that they did not contribute to the formulation of: (1) the Interim Guidance; (2) the policies and procedures concerning inmates at the prison and Covid-19; or (3) policies or procedures regarding the suspension of inmate programming until all inmates had complied with Covid-19 testing procedures. The defendants each declare that they did not authorize or put the sign on plaintiff's door.

Plaintiff maintains it is immaterial whether defendants made the relevant policy decisions, or whether they specifically authorized or placed the sign on his door. His position is that defendants are supervising medical professionals who "are ultimately responsible for all medical actions for their patients." ECF No. 58 at 1. Plaintiff argues that the quarantine, the quarantine sign and the information displayed on it, and the pause in inmate programming, are all "medical decisions." *Id*. at 1-2. However, it is not a foregone conclusion that these were purely non-custodial, medical policies and decisions made solely by medical professionals, and indeed defendants deny that they made these policies and decisions. The above discussion of *Seaton* demonstrates that legitimate penological concerns often outweigh any privacy interest a prisoner has in his medical information, and plaintiff has failed to show there were no legitimate penological reasons for the quarantine sign on plaintiff's door.

It therefore appears that the actual nature of plaintiff's Fourteenth Amendment claim against defendants is that they allegedly failed to safeguard his medical information *in the face of a legitimate penological interest in disclosing it*. Such a claim cannot succeed under *Seaton*. Because legitimate penological interests prevail, defendants as supervising medical professionals cannot have violated any privacy right by their action or inaction regarding the minimal disclosures on the quarantine sign. This is another independent and adequate basis for granting defendants' motion for summary judgment.

////

////

8

|     |                                                  |
| --- | ------------------------------------------------ |
| 1   | 3.    Defendants' Qualified Immunity Argument    |

Defendants argue they are entitled to qualified immunity because it was not clearly established as of December 2020 that placing the sign on plaintiff's door could violate plaintiff's Fourteenth Amendment right to medical privacy. ECF No. 54 at 22 (citing *Huling*). The court addresses the qualified immunity argument, even though it is recommending that defendants' motion for summary judgment be granted on its merits, because plaintiff continues to argue that he may have a claim against those responsible for the signage policy. *See* ECF No. 61; *see also* ECF No. 58 at 3 (plaintiff argues that defendants "are in no way entitled to qualified immunity" because they are "each responsible for the treatment of their patients as medical professionals").

Qualified immunity protects government officials from civil liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotations omitted). A defendant is entitled to qualified immunity "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2010). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id*. at 743.

Showing the unlawfulness of the conduct was "clearly established" requires a showing that "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id*. (citation and internal quotation marks omitted); *see also Kisela v. Hughes*, 540 U.S. 100, 105 (2018) (per curiam) ("An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" (citation omitted)). "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the [conduct] 'beyond debate.'" *Villanueva v. California*, 986 F.3d 1158, 1165 (9th Cir. 2021) (alteration in original) (quoting *Wesby v. District of Columbia*, 583 U.S. 48, 64, 138 S. Ct. 577, 590 (2018)).

////

The Supreme Court has warned courts not to define clearly established law "at too high a level of generality." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam); *Kisela*, 540 U.S. at 104. "[T]he farther afield existing precedent lies from the case under review, the more likely it will be that the officials' acts will fall within that vast zone of conduct that is perhaps regrettable but is at least arguably constitutional." *Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016). But "officials can still be on notice that their conduct violated established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (explaining that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful'") (alteration in original) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). Whether such a clearly established right exists is "a question of law" for the court to decide. *Morales v. Fry*, 873 F.3d 817, 819 (9th Cir. 2017)).

Even if the quarantine sign displayed constitutionally protected medical information, and even if there was no legitimate penological purpose for doing so, and even if defendants were responsible for placing the quarantine sign on plaintiff's door or for the relevant policy on signage, they would be entitled to qualified immunity because of the unsettled scope of any constitutional right of privacy in prison medical records. In *Scott v. Quigley*, No. 3:23-cv-264-ART-CLB, 2025 WL 1458001 (D. Nev. Apr. 29, 2025), defendants moved for summary judgment solely on the basis of qualified immunity. The prisoner had alleged that cell side consultations about his end-stage renal disease violated his right to medical privacy.

The *Scott* court noted that "whether a constitutional right to information privacy even exists, remains unsettled." *Id*. at *4. There were legitimate penological reasons for conducting the consultations and they "did not involve sensitive medical information that would not otherwise be known to other offenders in the unit given the frequency of [the prisoner's] transportation to dialysis." *Id*. Therefore, reasonable medical providers "would not have known that their conduct violated the law." *Id*. at 5 (collecting cases finding legitimate penological reasons for disclosure of medical information). As in *Scott*, defendants here would not have known that placing the quarantine sign on plaintiff's cell door violated the law according to the

10

uncertain scope of prisoners' right to medical privacy. Qualified immunity is a sufficient and independent reason to grant defendants' motion for summary judgment.

### 4. Futility Of Amendment

As noted, plaintiff unsuccessfully attempted to add a claim against CCHCS as the entity responsible for requiring the quarantine sign, but the amendment was denied based on Eleventh Amendment immunity. ECF Nos. 60, 62. Defendants, for their part, have stated that CCHCS "promulgated the policies and procedures for the clinical management of the COVID-19 Pandemic at CDCR facilities." ECF No. 54 at 16. Plaintiff has sought to discover who is responsible for the signage policy, ECF No. 45 at 5, and it seems he still maintains that he may have an actionable claim against whoever is responsible for the policy (whether CCHCS, or not). *See* ECF No. 61.

In light of the analysis above, any further amendment of the operative complaint to add a Fourteenth Amendment claim against persons who may be responsible for the placement of the quarantine sign, or who may be responsible for the policy regarding quarantine signs, would be futile. *See Ctr. For Bio. Diversity v. United States Forest Serv.*, 80 F.4th 943, 956 (9th Cir. 2023) ("Amendment is futile when 'it is clear … that the complaint could not be saved by any amendment.'" (quoting *Armstrong v. Reynolds*, 22 F. 4th 1058, 1071 (9th Cir. 2022))). If the quarantine sign on his cell door did not violate plaintiff's rights under the Fourteenth Amendment, then plaintiff cannot state any claim against anyone responsible for formulating the policy on quarantine signs.

### Eighth Amendment Failure To Protect Claim

#### A. Legal Standard

To establish a constitutional violation "based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). An inmate's Eighth Amendment rights are violated by a prison official if that official exposes an inmate to a "substantial risk of serious harm," while displaying "deliberate indifference" to that risk. *Id*. An official, however, is only liable if the "culpable action, or inaction[] is directly attributed to them" *Starr v. Baca*, 652 F.3d 1202, 1205

(9th Cir. 2011). Further, a plaintiff must have suffered some type of pain or harm that is more than de minimis in order to implicate the Eighth Amendment. *See, e.g.*, *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) ("delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference … unless the denial was harmful").

### B. The Evidentiary Record

Plaintiff alleges an "unreasonable exposure to threat of safety." ECF No. 45 at 6. The SAC alleges plaintiff received multiple threats from inmates to comply with testing because the quarantine sign on his door identified him as "the one disrupting the general program." *Id*. The threats were allegedly yelled "from cell to cell." *Id*. Plaintiff claims that these threats "coerced" him into "ultimately complying with testing against his wishes in fear for his safety." *Id*. He claims defendants knowingly exposed him to a potential threat and made him a target for other inmates.

Plaintiff's more detailed deposition testimony tempers some of his allegations. Plaintiff saw the quarantine sign when he stepped out of his cell to pick up his meal. ECF No. 54-7 at 12 ll.14-15; *id*. at 15 ll.19-23. He assumes that defendants, as supervising nurse and supervising doctors, were responsible for the quarantine sign. *Id*. at 20 ll.2-5, 14-17; *id*. at 21 ll.4-10; *id*. at 22 ll.1-7; *id*. at 22 l.19 to 23 l.4. Plaintiff testified somewhat confusingly that prison officials announced that the whole building would remain under "lockdown" until everyone complied with testing. *Id*. at 16 ll.12-15. However, plaintiff also testified that the non-quarantined inmates were not confined to their cells. Tr. 25. It thus appears that non-quarantined inmates were simply not allowed to have their "general program," meaning their normal activities such as classes. *See* ECF No. 45 at 6; ECF No. 54-7 at 18 ll.9-11. Because non-quarantined inmates were allowed to leave their cells, they could walk around and see the "multiple" signs scattered around the building showing which inmates failed to test. Tr. 25; ECF no. 54-7 at 18 ll.1-2.

There were multiple prisoners refusing to test, and so the programming halt was not just because of plaintiff's refusal. ECF No. 54-7 at 18 ll.4-9. Right after the quarantine announcement, or perhaps within a day or two, someone shouted out "'you guys better start testing.'" *Id*. at 17 ll.20-21. Plaintiff heard at least one other similar shouted threat within the

first day or two of the quarantine. *Id*. at 17 ll.6-9. He does not know who shouted. *Id*. at 16 ll.10-12. No one approached plaintiff's door or threatened him personally. *Id*. 18 ll.12-16. Plaintiff had no contact with other inmates during the quarantine. *Id*. at 14 ll.11-12; *id*. at 15 ll.3-5. He was not harmed by other inmates. *Id*. at 18 ll.23-25.

Plaintiff remained in quarantine for "[a] couple weeks, [a] week, [m]aybe two" before complying with testing. *Id*. at 14 ll.13-15. Starting to test "seemed to be the only way to remove myself from quarantine" and was his "only option" to avoid harm from other inmates, although he "can only speculate" and has "no idea" how other inmates could have harmed him while confined in his cell. *Id*. at 14 ll.16-17; *id*. at 18 l.25 to 19 l.5.

C.     Analysis

Defendants argue that plaintiff's testimony, taken as true, shows he was not subjected to an objective or actual threat from other inmates, and was never actually deprived of his safety in a sufficiently serious manner to support an Eighth Amendment claim. ECF No. 54 at 18-19. *Id*. The court agrees.

There is no genuine dispute that other inmates did not make threats directed personally at plaintiff as a result of the quarantine sign. There were multiple inmates who refused to test, not just plaintiff. The two shouted statements that plaintiff claims to have heard in the first or second day of the quarantine are more in the nature of admonitions than threats ("you guys better start testing"), and there is no indication the shouts were directed specifically at plaintiff. Plaintiff has no other evidence of any threat directed toward him.

Plaintiff admits he suffered no actual harm. Finally, plaintiff waited at least a week, and possibly two weeks, before he consented to testing. This evident lack of urgency about having the sign removed is another indication that plaintiff experienced no objective or actual threat from other inmates because of the quarantine sign.

Even if plaintiff had shown an actual and substantial risk of serious harm because of the quarantine sign, he has not shown that defendants were responsible -- let alone deliberately indifferent -- for endangering him through formulating policy or placing the sign on his door, as discussed above. For all these reasons, plaintiff has failed to show a genuine issue of material

13

fact for trial, and defendants are entitled to summary judgment on plaintiff's Eighth Amendment claim.[6]

### Grievance Exhaustion

Finally, the parties agree that plaintiff exhausted a single health care grievance about the sign on his door. ECF No. 45 at 10-20. Defendants argue that this grievance failed to identify them by name and title. They also point out that plaintiff's grievance did not mention "threats from other inmates or anything else that allegedly constituted an excessive risk to Plaintiff's health or safety." ECF No. 54 at 24.

The grievance complained only that: (1) "[t]he current quarantine length according to CDCR guidelines is 10 days, not 21;" (2) the quarantine sign violated plaintiff's private medical information; and (3) plaintiff has a right to refuse health care services. ECF No. 45 at 11, 12.

Plaintiff was required to list all staff members involved in the grievance issue or at least describe their involvement to the best of his knowledge. Cal. Code Regs. tit. 15 § 3084(c)(2). Plaintiff's failure to name defendants in his grievance is not fatal in this instance, because the grievance acknowledges that quarantine measures were being implemented according to guidelines. This appears to have been a sufficient effort to assign responsibility for the quarantine sign to the best of plaintiff's knowledge. *See Reyes v. Smith*, 810 F.3d 654 (9th Cir. 2016) (a grievance sufficiently identified staff where prison officials "plainly knew that the Pain Management Committee, of which Drs. Smith and Heatley were members, had decided Reyes should not receive the medication").

However, the grievance only mentioned plaintiff's issue about medical information privacy, and not his issue about failure to protect from threats to safety. Therefore, the grievance only exhausted plaintiff's Fourteenth Amendment claim and not his Eighth Amendment claim. This is another independent and sufficient reason to dismiss the Eighth Amendment claim.

////

////

---

[6] The court need not reach defendants' qualified immunity argument on plaintiff's Eighth Amendment claim.

14

**RECOMMENDATION**

For the foregoing reasons, IT IS HEREBY RECOMMENDED that defendant's motion for summary judgment (ECF No. 54) be granted, judgment entered for defendant, and this case closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated: September 5, 2025

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE